IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ERNESTO HERNANDEZ,<br><br>Defendant. | CR. NO. 13-00511(1) JMS<br><br>ORDER DENYING DEFENDANT'S EMERGENCY MOTION TO REDUCE SENTENCE UNDER FIRST STEP ACT (COMPASSIONATE RELEASE), ECF NO. 168 |

## ORDER DENYING DEFENDANT'S EMERGENCY MOTION TO REDUCE SENTENCE UNDER FIRST STEP ACT (COMPASSIONATE RELEASE), ECF NO. 168

## I. <u>INTRODUCTION</u>

On May 21, 2020, Defendant Ernesto Hernandez ("Defendant") filed an emergency motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for compassionate release, reduction of his sentence to time served, and conversion of the remainder of his sentence to home confinement. ECF No. 168. Defendant seeks release from the Federal Correctional Institution Oakdale II ("FCI Oakdale II") due to pre-existing medical conditions and the COVID-19 pandemic. *See* ECF No. 168-1 at PageID #1109. The court decides the motion without a hearing under Local Rule 7.1(c). Based on the following, the court DENIES the motion.

1

## II. **BACKGROUND**

On January 10, 2014, a jury found Defendant guilty of possession with intent to distribute methamphetamine, and conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846. ECF Nos. 113, 128. On April 28, 2014, the court sentenced him to a total term of 180 months imprisonment, and five years of supervised release. ECF No. 128 at PageID #385. On July 16, 2015, the Ninth Circuit upheld his conviction and sentence. ECF No. 144. Defendant has served nearly seven years in prison, and his anticipated release date is May 28, 2026. *See* ECF No. 168-1 at PageID #1121; ECF No. 168-2 at PageID #1125.

On May 21, 2020, Defendant, represented by the Office of the Federal Public Defender for the District of Hawaii, filed the instant motion for compassionate release. ECF No. 168. On June 5, 2020, the United States filed its Opposition, ECF No. 174, and on June 9, 2020, Defendant filed a Reply, ECF No. 178.

Defendant is currently 57-years old and contends that he fits the criteria for release because (1) he suffers from asthma and hypertension; (2) the Bureau of Prisons ("BOP") has not only "failed to prevent the spread of COVID-

2

19 . . . at the Oakdale I and II facilities," but the COVID-19 crisis at FCI Oakdale I and II is "escalating;" and (3) at least one inmate housed at FCI Oakdale II has died due to the virus.  *See* ECF No. 168 at PageID #1106; ECF No. 168-1 at PageID #1109-15; ECF No. 168-2 at PageID #1125.  He further contends that he has embraced opportunities in prison to improve and rehabilitate himself by completing multiple education and drug programs, has had no disciplinary sanctions after sentencing, and would not endanger the community upon release. ECF No. 168-1 at PageID #1121.  Defendant's motion includes his release plan— to live with his wife at their home in Kapolei, Hawaii, or alternatively, to be released to Immigration and Customs Enforcement ("ICE") custody to address his pending immigration detainer and possible deportation to Mexico.  *Id.* at PageID #1122.

According to Defendant, his daughter submitted a request for compassionate release on his behalf, which was delivered to the FCI Oakdale II warden on April 13, 2020, and that as of May 15, 2020, Defendant had not received a response.  *Id.* at PageID #1110, 1116.  *See also* ECF No. 168-3 (request); ECF Nos. 168-4 (email dated May 15, 2020 indicating that as of that date, Defendant had not received a response).

The Government recognizes that Defendant suffers from acute asthma and provided medical records showing that Defendant is being treated for, among other things, asthma, high blood pressure, and high cholesterol. *See* ECF No. 177 at PageID #1245, 1266. The Government further recognizes the risks presented by COVID-19 at BOP facilities and in the community, but contends that (1) the BOP has and continues to take significant measures to protect inmates' health; and (2) given the low numbers of reported active and recovered cases at FCI Oakdale II, the COVID-19 outbreak at that facility is relatively contained. *See* ECF No. 174 at PageID #1220-23. The Government argues that, considering all the circumstances, Defendant fails to establish the requisite extraordinary and compelling reasons to reduce his sentence by six years and in any case, because there is an ICE detainer, release to home confinement would be unrealistic.

### III. <u>DISCUSSION</u>

Defendant moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018,[1] which provides in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

---

[1] Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).

motion on the defendant's behalf or the lapse of 30 days
from the receipt of such a request by the warden of the
defendant's facility, whichever is earlier, may reduce the
term of imprisonment . . . after considering the factors set
forth in [18 U.S.C.] section 3553(a) to the extent that
they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant
such a reduction;
. . . .
and that such a reduction is consistent with applicable
policy statements issued by the Sentencing
Commission[.]

*Id.*

The Government concedes that more than thirty days have passed

since a request for compassionate release was delivered to the FCI Oakdale

warden, and therefore, the motion is properly before this court.  ECF No. 174 at

PageID #1219.

**A.     The Court Has Discretion to Determine Whether Extraordinary and
Compelling Reasons Exist to Reduce Defendant's Sentence**

Before the First Step Act was enacted, Congress directed the

Sentencing Commission to issue a policy statement defining "extraordinary and

compelling reasons" for compassionate release "including the criteria to be applied

and a list of specific examples."  *See* 28 U.S.C. § 944(t).  The policy statement,

United States Sentencing Guideline ("USSG") § 1B1.13, provides three specific

5

examples of extraordinary and compelling reasons, along with a fourth, catch-all provision granting discretion to the BOP Director:

(A) Medical Condition of the Defendant.

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.  As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

USSG § 1B1.13 n.1.  The Sentencing Commission also requires that (1) the motion be filed by the BOP Director, (2) the court consider the § 3553(a) factors, (3) the defendant not pose a danger to the safety of any other person or to the community, and (4) a sentence reduction be "consistent with this policy statement."  USSG § 1B1.13 & n.4.

But the Sentencing Commission has not updated this policy statement to reflect the First Step Act's amendments—after exhaustion, defendants may now bring motions for compassionate release to the courts without having to rely on the BOP Director to seek such relief.  And the Sentencing Commission will not be able to update its policy statement until it once again has four voting commissioners. *See, e.g.*, *United States v. Haynes*, 2020 WL 1941478, at *12 n.20 (E.D.N.Y. Apr. 22, 2020).  Thus, the Sentencing Commission's § 1B1.13 policy statement, by its plain terms, is no longer consistent with § 3582(c)(1)(A).  That is, the policy

7

statement requiring that motions be filed by the BOP Director conflicts with the
amended statute that allows defendants to file such motions.

   Courts addressing motions for compassionate release are split as to
whether they are bound by, or may disregard, the policy statement's deference to
the BOP Director in "determining what 'other reasons' . . . qualify as extraordinary
and compelling." *Hirano v. United States*, 2020 WL 1861659, at *2 (D. Haw. Apr.
30, 2020); *see also, e.g.*, *United States v. Conner*, 2020 WL 3053368, at *3 (N.D.
Iowa, June 8, 2020) (citing cases); *United States v. Van Cleave*, 2020 WL
2800769, at *3 (W.D. Wash. May 29, 2020) (discussing and citing cases).

   Some courts have concluded that they lack discretion to determine
whether other extraordinary and compelling reasons exist based on the plain
language of subsection (D) reserving such discretion to the BOP Director. *See,
e.g.*, *United States v. Hickman*, 2020 WL 2838544, at *2-3 (E.D. Ky. June 1, 2020)
(citing *United States v. Lynn*, 2019 WL 3805349 (S.D. Ala. Aug. 13, 2019)); *Riley
v. United States*, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020) ("The First
Step Act did not abrogate [the] statutory requirement" that "any sentencing
reduction [be] consistent with the applicable policy statements issued by the
sentencing Commission.") (citation and internal quotation marks omitted); *United
States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("In the

absence of contrary controlling authority, and given the limited statutory

exceptions to the general rule of finality of judgments, this court will continue to

follow the guidance of the Sentencing Commission's policy statement limiting the

scope of 'extraordinary and compelling reasons' that warrant compassionate

release under § 3582(c)(1).").

But a growing majority of courts have concluded that given the First

Step Act amendments, the USSG policy statement does not limit the court's

independent assessment of whether extraordinary and compelling reasons exist.

*See, e.g.*, *United States v. Kamaka*, 2020 WL 2820139, at *3 (D. Haw. May 29,

2020) (recognizing that before the First Step Act was enacted, "the Sentencing

Commission determined that the BOP Director had wide discretion in determining

whether extraordinary and compelling reasons existed," and reasoning that "[t]hat

guidance is consistent with a recognition that courts now can exercise the same

discretion"); *Van Cleave*, 2020 WL 2800769, at *5 (finding the guidance of the

policy statement not binding, but only persuasive, after amendment of

§ 3582(c)(1)(A), and thus, the court has discretion to consider whether

extraordinary and compelling reasons exist); *Conner*, 2020 WL 3053368, at *3

("[A]lthough the [USSG] provides helpful guidance on what constitutes

extraordinary and compelling reasons, it is not conclusive given the recent

statutory changes."); *United States v. Perez*, 2020 WL 1180719, at *2 (D. Kan.

Mar. 11, 2020) ("[A] majority of federal district courts have found that the most

natural reading of the amended § 3582(c) and 28 U.S.C.

§ 994(t) is that the district court assumes the same discretion as the BOP Director

when it considers a compassionate release motion properly before it.") (internal

quotation omitted); *United States v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal.

Mar. 3, 2020) ("[A] growing number of district courts have concluded the

Commission lacks an applicable policy statement regarding when a judge can grant

compassionate release because the Commission never harmonized its policy

statement with the [First Step Act].") (quoting *United States v Brown*, 411 F. Supp.

3d 446, 449 (S.D. Iowa 2019)).

United States v. Cantu*, 423 F. Supp. 3d 345 (S.D. Tex. 2019), an

early proponent of the latter view, reasoned:

> Although Congress empowered the Commission to issue
> policy statements regarding the appropriate use of the
> sentence-modification provisions under § 3582, 28
> U.S.C. § 944(a)(2)(C), Congress may override the
> Commission's policy statements by statute.
> . . .
> Before the First Step Act's amendments to § 3582, it
> made sense that the BOP would have to determine any
> extraordinary and compelling reasons—only the BOP
> could bring a motion for a reduction of sentence under

> § 3582(c)(1)(A).  But defendants no longer need the
> blessing of the BOP to bring such motions.  The BOP in
> fact may never weigh in or provide guidance when a
> § 3582(c) motion is brought by a defendant.  Given the
> changes to the statute, the policy-statement provision that
> was previously applicable to 18 U.S.C. § 3582(c)(1)(A)
> no longer fits with the statute and thus does not comply
> with the congressional mandate that the policy statement
> must provide guidance on the *appropriate use* of
> sentence-modification provisions under § 3582.

*Id.* at 350-51 (internal footnote and citations omitted).

When interpreting the USSG, courts must "us[e] the ordinary tools of

statutory interpretation," *United States v. Martinez*, 870 F.3d 1163, 1166 (9th Cir.

2017), beginning with the statutory text and the "assumption that the ordinary

meaning of that language accurately expresses the legislative purpose," *Park 'N

Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  Courts should not

"confine [themselves] to examining a particular statutory provision in isolation,"

*Brown v. Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); rather, "the

structure and purpose of a statute may also provide guidance in determining the

plain meaning of its provisions."  *The Wilderness Soc'y v. U.S. Fish & Wildlife

Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003).  Where there is ambiguity, courts

should evaluate alternative interpretations of statutory language "in light of the

purpose of the statute" and construe the statutory text in a way that "makes . . .

sense . . . as a means of attributing a rational purpose to Congress."  *In re Warren*,

568 F.3d 1113, 1117-18 (9th Cir. 2009) (quotations and citations omitted).  *See also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citation omitted).

Here, the court must consider the policy statement consistent with the overall statutory scheme, including the First Step Act amendments.  That is, the policy statement requiring that motions be filed by the BOP Director conflicts with the amended statute that allows defendants to seek compassionate release without the BOP's support.  Given clear congressional intent to provide defendants a path to compassionate release in the absence of BOP support, it makes little sense to apply the policy statement in a way that precludes the court from making the necessary individualized determinations to rule on such motions.  *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1272 (9th Cir. 2020) ("We avoid absurd results when interpreting statutes.").  Thus, the court finds that the discretion to determine whether "other" extraordinary and compelling reasons exist granted by subsection (D) to the BOP Director applies equally to the court when ruling on motions for compassionate release.

**B.     Defendant Does Not Meet the Criteria for Compassionate Release**

Defendant does not claim, and the court does not find, that he satisfies any of the extraordinary and compelling reasons set forth in USSG § 1B1.13 n.1(A)-(C).  Instead, Defendant contends that *other* "extraordinary and compelling" reasons exist, pursuant to subsection (D), because (1) there is an escalating COVID-19 crisis at the Oakdale complex, and (2) his medical conditions—acute asthma, high blood pressure, and high cholesterol—place him at high risk for serious medical complications or death should he contract COVID-19. ECF No. 168-1 at PageID #1109-10, 1112; ECF No. 178 at PageID #1364.  The Government disagrees, contending that Defendant's medical conditions are well-controlled by medication and treatment, that COVID-19 is relatively contained at Oakdale II, and that Defendant is able to provide self-care in the facility.  ECF No. 174 at PageID #1225.

### 1.     *Presence of COVID-19 at FCI Oakdale II*

The presence of COVID-19 at the Oakdale Complex, comprising FCI Oakdale I and FCI Oakdale II cannot be disputed.  According to BOP's COVID-19 Cases website, as of June 23, 2020, these facilities combined (that is Oakdale I and II) reported 30 inmates and 15 staff with active COVID-19 cases, 8 inmate deaths, and 187 inmates and 14 staff who have recovered.  *See* https://www.bop.gov/

13

coronavirus/ (last visited June 23, 2020); *see also* Memorandum from Attorney

General William Barr to Director of BOP, *The Increasing Use of Home*

*Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020) ("Barr

Memo") available at https://www.justice.gov/coronavirus (last visited June 23,

2020) (instructing the BOP to maximize transfer to home confinement of "all

appropriate inmates held at *FCI Oakdale* . . . and similarly situated . . . facilities

where COVID-19 is materially affecting operations") (emphasis added).

But although FCI Oakdale I and II are part of the same complex, they

are separate facilities. *See* BOP's Our locations website, available at

https://www.bop. gov/locations/institutions/oad/ (last visited June 23, 2020).  And

out of the combined COVID-19 numbers for the entire Oakdale complex, FCI

Oakdale II accounts for no inmates and 5 staff with active cases, 6 inmates and 4

staff who have recovered, and 1 inmate death.  *See* https://www.bop.gov/

coronavirus/ (last visited June 23, 2020).  That is, the vast majority of COVID-19

cases at the Oakdale complex are and have been at FCI Oakdale I.  *See id.*  And

although Attorney General Barr recognized that COVID-19 was materially

affecting operations at FCI Oakdale in his April 3, 2020 memo, *see* Barr Memo,

the June 23, 2020 numbers show that FCI Oakdale II has had relatively few

COVID-19 cases.  Given the small numbers at FCI Oakdale II and the fact that

14

there are currently no inmates there with active COVID-19, the court finds that

FCI Oakdale II is not having a COVID-19 crisis, let alone an "escalating COVID-

19 crisis."  Further, the numbers at FCI Oakdale II have not increased over the past

three weeks.  *See United States v. Leal*, 2020 WL 2836993, at *1 (D. Kan. June 1,

2020) ("As of May 31, 2020, seven inmates and eight staff members at FCI

Oakdale II ha[ve] tested positive for COVID-19 . . . [and] [o]ne of the [seven]

inmates who contracted COVID-19 died.").

Defendant contends that BOP's COVID-19 numbers for Oakdale II

may be low, relying on a news article in *The Lens* reporting that the entire Oakdale

complex stopped COVID-19 testing of inmates in late March due to "sustained

transmission," and only resumed voluntary testing at FCI Oakdale I, but not FCI

Oakdale II, in mid-May.  *See* ECF No. 168-1 at PageID #1113-14; ECF No. 178 at

PageID #1360-61 (quoting *The Lens*, Oakdale Federal Prison Resumes and

Expands COVID-19 Testing, https://thelensnola.org/2020/05/18/oakdale-federal-

prison-resumes-and-expands-covid-19-testing)).  But according to the BOP

website, as of June 23, 2020, 86 inmates at Oakdale II have been tested (either at

Oakdale II or at a prior facility), and with 2 test results pending, there are currently

no inmates with positive COVID-19 tests.  Thus, even assuming the BOP is not

providing voluntary testing at Oakdale II, that fact alone is not sufficient to establish that FCI Oakdale II has an escalating COVID-19 crisis.

In short, based on the evidence presented, the court finds that, to date, COVID-19 is relatively contained at FCI Oakdale II.

### 2. *Defendant is at Higher Risk of COVID-19 Complications Due to Underlying Medical Conditions*

Nevertheless, Defendant does suffer from underlying medical conditions that place him at higher risk for serious complications should he contract COVID-19.  According to the Centers for Disease Control and Prevention ("CDC"), those at higher risk for severe illness from COVID-19 include individuals of all ages with "moderate to severe asthma" and those with "serious heart conditions, including . . . pulmonary hypertension," particularly if not well controlled.  *See* https://www. cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 23, 2020).[2]  Defendant's medical records show that he is currently being treated for both acute asthma and hypertension.  Thus, even though Defendant's underlying medical conditions are

---

[2] Although Defendant urges the court to consider high cholesterol as an elevated risk factor, it is not currently among the higher risk conditions identified by the CDC.  *See* https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/groups-at-higher-risk. html#serious-heart-conditions (last visited June 23, 2020) (listing serious heart conditions, including coronary artery disease, but not high cholesterol, as higher risk conditions).

well-controlled by medication and treatment, he is among those identified by the

CDC to have an elevated risk for complications from COVID-19.

However, merely being at higher risk for serious complications from

COVID-19 is not, by itself, sufficient for the court to find the requisite

extraordinary and compelling reasons for compassionate release.  That is, not every

individual at higher risk for serious complications from COVID-19 is entitled to

immediate release from incarceration.  The court thus turns to a consideration of

the 18 U.S.C. § 3553(a) factors and whether Defendant is a danger to the

community.

### 3.  *Section 3553(a) Factors*

Consideration of the § 3553(a) factors counsels against release.  First,

as to the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1),

Defendant's pretrial bail was revoked twice, *see* PSR at 2, ECF No. 129 at PageID

#391, and he apparently lied about the circumstances leading to both revocations,

*see* PSR ¶¶ 21, 24; Tr. at 10:4-6,14:5-11, ECF No. 141 at PageID #952, 956.  In

one instance, Defendant told a co-defendant and another person to "keep your

mouths shut" as "the Feds are watching you and me."  PSR ¶ 24, ECF No. 129 at

PageID #397.  In addition, Defendant lied under oath at this trial—in fact, during

sentencing, this court observed that it had "seldom heard a defendant lie as often

17

and as much about such critical core parts of a case than this defendant did. . . .

Statement after statement out of [Defendant's] mouth was a lie."  Tr. at 13:6-12,

ECF No. 141 at PageID #955.

Second, as to "the nature and circumstances of the offense," 18 U.S.C.

§ 3553(a)(1), Defendant received a Guideline upward adjustment for his

aggravating role in the offense.  *See* PSR ¶ 34, ECF No. 129 at PageID #399.

Further, a consideration of the § 3553(a)(2) factors weighs against

release.[3]  Defendant has approximately six years remaining on his 15-year

sentence, *see* https://www.bop.gov/mobile/find_inmate/index.jsp#inmate_results

(last visited June 23, 2020) (indicating Defendant's projected release date is May

28, 2026), and the court imposed a significant sentence in part, "to reflect the

seriousness of the offense, promote respect for the law, and provide just

punishment," as well as "to afford adequate deterrence and to protect the public

from further crimes of the defendant."  Tr. at 15:19-21 & 16:7-9, ECF No. 141 at

---

[3] These include the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct; [and]
(C) to protect the public from further crimes of the defendant[.]

18 U.S.C. § 3553(a)(2).

PageID #957-58.  The significant sentence reduction that Defendant seeks would greatly undermine these statutory purposes of sentencing.

Further, although Defendant has embraced opportunities in prison to improve himself and rehabilitate by completing multiple education and drug programs, an overall weighing of the § 3553(a) factors does not support Defendant's release.  And because the § 3553(a) factors do not support release, the court need not address whether Defendant would pose a danger to the community.

In sum, even considering Defendant's higher risk of serious medical complications from COVID-19, because COVID-19 is relatively contained at FCI Oakdale II and a reduction of sentence is not consistent with the § 3553(a) factors, Defendant does not meet the criteria for compassionate release.[4]

///

///

---

[4] And in any case, because of Defendant's ICE detainer, it is doubtful that he could be released in to the community.  *See McLean v. Crabtree*, 173 F.3d 1176, 1180 (9th Cir. 1999) (discussing specific BOP programs that exclude prisoners who have ICE detainers); *United States v. Bennett*, 2020 WL 2539077, at *2 (S.D.N.Y. May 18, 2020) ("ICE's detainer renders [defendant] ineligible for community-based programs, including home confinement."); *but see United States v. Al-Jumail*, 2020 WL 2395224, at *7 (E.D. Mich. May 12, 2020) (recognizing that "under normal BOP guidelines, defendants with ICE detainers are ineligible for sentence reduction programs," and noting that recent "Department of Justice directives instruct the BOP to consider 'all at-risk inmates—not only those who were previously eligible for transfer' into home confinement").

Whether ICE will detain or immediately deport Defendant is not before this court. Nevertheless, it is worth noting that Defendant's release plan—for home confinement with his wife in Kapolei, Hawaii—is unrealistic.

## IV.  **CONCLUSION**

For the foregoing reasons, Defendant's motion for compassionate

release, ECF No. 168, is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 24, 2020.



　　/s/ J. Michael Seabright　　
J. Michael Seabright
Chief United States District Judge

*United States v. Hernandez*, Crim. No. 13-00511 JMS, Order Denying Defendant's Motion to
Reduce Sentence Under First Step Act (Compassionate Release), ECF No. 168